In re Brian Paul JACKS, Debtor.

Jaime B. Nahman, Ph.D., Appellant,

v.

Brian Paul Jacks, Appellee.

BAP No. CC–00–1032–BMoP.
Bankruptcy No. LA 98–36713 SB.
Adversary No. LA 98–02816 SB.

United States Bankruptcy Appellate Panel
of the Ninth Circuit.

Argued and Submitted July 19, 2000.

Memorandum Filed Oct. 31, 2000.

Amended Opinion Filed Aug. 21, 2001.

John Winandy, Law Offices of John R. Winandy, Los Angeles, CA, for Jaime B. Nahman.

Sharon Coverly Hughes, Hayes, Hughes & Dunstan, LLP, Encino, CA, for Brian Paul Jacks.

Before: BRANDT, MONTALI and PERRIS, Bankruptcy Judges.

## AMENDED OPINION

BRANDT, Bankruptcy Judge.

In 1997, appellant Jamie Nahman ("Nahman" or "plaintiff") obtained a state court judgment against Zeus Medical Corporation ("Zeus") and its alter ego, debtor Brian Paul Jacks ("Jacks" or "defendant"), for $116,882.25 (including interest and costs), on breach of contract and common counts. Jacks filed for chapter 7[1] relief on 2 July 1998. Thereafter, Nahman filed this adversary proceeding to have his state court judgment against Jacks declared nondischargeable for fraud, defalcation while acting in a fiduciary capacity, and for willful and malicious injury.

On cross motions, the bankruptcy court entered summary judgment for Jacks, dismissing all claims[2]. On appellant's motion for rehearing, we amend our disposition

---

1. Absent contrary indication, all section and chapter references are to the Bankruptcy Code, 11 U.S.C. §§ 101–1330. All "Rule" references are to the Federal Rules of Bankruptcy Procedure, and "FRCP" references are to the Federal Rules of Civil Procedure.

2. We note that the Judgment on appeal, prepared by counsel, reads "11 U.S.C. § 423 . . ." Consistent with the bankruptcy court's published opinion, we presume the references are to section 523 and not 423.

and AFFIRM in part, REVERSE in part, and REMAND.

## I. FACTS

The bankruptcy court's published decision, *Nahman v. Jacks (In re Jacks)*, 243 B.R. 385, 387–88 (Bankr.C.D.Cal.1999) sets forth the facts:

> [Appellant] ... Nahman is a psychologist who worked as an independent contractor for Zeus Medical Corp. ("Zeus"), a California corporation. Nahman's duties included performing psychological and nonpsychological testing and preparing reports, which Zeus submitted to lawyers or insurance companies in connection with pending workers' compensation disability claims. Nahman was entitled to separate compensation for each report that he submitted.

> Debtor Brian Jacks was president and chief financial officer of Zeus, and one of its two directors [and shareholders]. Instead of receiving a fixed compensation from Zeus, Jacks withdrew funds from the corporate bank account for his personal use on an irregular and informal basis. These withdrawals were not documented as either compensation or loans.

> In approximately 1991, Zeus began experiencing financial difficulty. Zeus did not pay Nahman for a period of three months in 1991, and Zeus' debt to Nahman grew to more than $80,000. The financial difficulties continued in 1992, and Jacks wrote Nahman a letter explaining that Nahman had not been paid because "the money was just not available in the corporation."

> During Zeus' financial difficulties in 1991 and 1992, Jacks continued to use funds from Zeus for personal purposes. During that time, Jacks also refinanced several personal loans with Landmark Bank ("the bank"), which Zeus guaranteed and secured [3] with all of its corporate assets (consisting primarily of anticipated insurance payments based on Nahman's reports). In October, 1992 Jacks filed a prior chapter 11 case and ceased paying his personal obligations to the bank.[4] The bank thereafter obtained a judgment against Zeus and J & J Psychiatric (a partnership of which Jacks was a general partner) for approximately $270,000. To pay the judgment, Zeus assigned its receivables to the bank. As of September 1996, the bank had received approximately $141,000 from Zeus' receivables.

> After a seven-day trial in state court, Nahman received a joint and several judgment for $116,882.25 against Jacks and Zeus on causes of action for breach of contract and common counts. The state court found that Jacks was the alter ego of Zeus on the grounds that he was the president and CEO of Zeus, he controlled the corporate assets and commingled them with his own personal funds, and he assigned the corporate assets in satisfaction of his personal loans. The state court granted judgment to Jacks and Zeus on a cause of action for promissory fraud.

(Footnotes omitted.)

Jacks filed for chapter 7 relief on 2 July 1998, and thereafter Nahman commenced this adversary proceeding. Jacks moved for summary judgment on all claims; Nah-

---

**3.** [Panel's note: the corporate guaranty, executed by Jacks on its behalf, was given on 13 April 1992, and the security agreement on 16 October 1992. The financing statement was filed 20 October 1992.]

**4.** [Panel's note: the chapter 11 case was dismissed].

man moved for summary judgment on the defalcation claim. The bankruptcy court entered summary judgment for Jacks on all claims. This appeal ensued.

By unpublished memorandum filed 31 October 2000 we affirmed; Nahman moved for rehearing. We have reconsidered that disposition, and this opinion supersedes our prior memorandum.

## II. JURISDICTION

The bankruptcy court had jurisdiction via 28 U.S.C. § 1334 and § 157(b)(1) and (b)(2)(I), and we do under 28 U.S.C. § 158(c).

## III. ISSUES

Whether the bankruptcy court erred in entering summary judgment for Jacks dismissing Nahman's claims of nondischargeability for:

A. fraud;

B. defalcation as fiduciary; or

C. willful and malicious injury.

## IV. STANDARD OF REVIEW

■ We review summary judgment de novo. *Baldwin v. Kilpatrick (In re Baldwin),* 245 B.R. 131, 134 (9th Cir. BAP 2000), *aff'd,* 249 F.3d 912 (9th Cir.2001). We must determine, viewing the evidence in the light most favorable to the non-moving party, whether there is any genuine issue of material fact, and whether the trial court correctly applied relevant substantive law. *Graulty v. Brooks (In re Bishop, Baldwin, Rewald, Dillingham & Wong, Inc.),* 819 F.2d 214, 215 (9th Cir. 1987). We may uphold summary judgment on any basis supported by the record. *See Jonas v. Resolution Trust Corp. (In re Comark),* 971 F.2d 322, 324 (9th Cir.1992).

■ We review standing, a jurisdictional prerequisite, de novo. *Paine v. Dickey (In re Paine),* 250 B.R. 99, 104 (9th Cir. BAP 2000).

## V. DISCUSSION

### A. *Section 523(a)(2)(A)—Fraud*

■ Section 523(a)(2)(A) excepts from discharge any debt for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by false pretenses, a false representation, or actual fraud. To prove actual fraud under this section,

> a creditor must establish: (1) that the debtor made a representation; (2) the debtor knew at the time the representation was false; (3) the debtor made the representation with the intention and purpose of deceiving the creditor; (4) the creditor relied on the representation; and (5) the creditor sustained damage as the proximate result of the representation.

*Apte v. Japra, M.D., F.A.C.C., Inc., (In re Apte),* 96 F.3d 1319, 1322 (9th Cir.1996) (citations omitted).

Nahman's complaint alleged reliance on numerous affirmative misrepresentations: Jacks' representation that he would notify Nahman when insurance payments were received; Jacks' "repeated promises of payment"; representations that Jacks "was expecting large payments in the near future sufficient to pay Plaintiff the balance owed to him"; Jacks' "agreement to be personally liable for corporate obligations"; and Jacks' "representations that he would operate his business in a prudent manner in order to maximize profits and remain solvent until insurance payments were received for Plaintiff's reports."

■ In his motion for summary judgment, Jacks relied on the collateral estoppel effect of the state court judgment finding in his favor on Nahman's promissory

fraud claim. In opposing that motion, Nahman contended for the first time that the misrepresentation was Jacks' failure to disclose his self-dealing transactions when he was under a duty to do so. The bankruptcy court acknowledged Jacks' collateral estoppel argument, but did not dismiss on that basis. This was correct: under California law, collateral estoppel applies only if the issues are identical and if the issue in question has been "actually litigated." *Baldwin*, 245 B.R. at 134. The question of whether Jacks' failure to disclose was fraudulent was not actually litigated; there was no collateral estoppel respecting that issue. The bankruptcy court dismissed Nahman's § 523(a)(2)(A) claim because the facts supporting Nahman's fraud claim did not appear in the complaint, and, under FRCP 9(b), applicable via Rule 7009, fraud must be pleaded with particularity.

◼ The bankruptcy court properly granted summary judgment to Jacks on this claim. Although we are skeptical that a trial court may properly dismiss a claim on summary judgment based solely on pleading deficiencies, the evidence before the bankruptcy court here did not raise an issue of material fact as to the requisite elements under § 523(a)(2)(A): the only pertinent evidence was Jacks' unrebutted declaration that he intended to pay Nahman.

On appeal, Nahman argues that the evidence before the court was sufficient for a rational trier of fact to find that Jacks' debt to Nahman was for services obtained as the result of nondisclosure of his self-dealing and misappropriation of corporate funds.[5] Even if the bankruptcy court

erred in dismissing Nahman's claim because of his pleading deficiencies, Nahman fails to point out law or evidence supporting his claim.

◼ First, while nondisclosure of information that the debtor has a duty to disclose may constitute a false representation under § 523(a)(2)(A), *Tallant v. Kaufman (In re Tallant)*, 218 B.R. 58, 65 (9th Cir. BAP 1998), until his petition for rehearing, Nahman did not cite any authority for the proposition that Jacks owed him a duty to disclose. In *Tallant*, the debtor was an attorney, and his duty to disclose arose out of the California Rules of Professional Conduct. Nahman cited no parallel duty here: in his opposition to Jacks' motion for summary judgment, Nahman argued, without citation to authority, that the duty to disclose arose as a result of the parties' "relationship of trust and confidence" based on their deferred payment arrangement and Jacks' superior knowledge of the corporation's finances. Although he attempts to remedy that shortcoming in his petition for rehearing, those arguments come too late. *See Law Offices of Neil Vincent Wake v. Sedona Inst. (In re Sedona Inst.)*, 220 B.R. 74, 76 (9th Cir. BAP 1998) (holding matters not specifically and distinctly argued in appellant's opening brief are deemed waived).

Second, the sequence of alleged misrepresentation and performance is not set forth in Nahman's brief, nor has he specified where in the 1600+ page record to find it. Nahman's and Jacks' state court testimony indicated that, although Nahman continued to perform services for Jacks as late as May 1992, he ceased submitting reports in January or February

---

5. In his petition for rehearing, Nahman contends that Jacks failed to carry his initial burden because of his misplaced reliance on the collateral estoppel effect of the state court findings. Accordingly, Nahman argues, our

inquiry should have ended there. However, as Nahman implicitly acknowledged, we cannot determine whether he raised an issue of material fact without examining the evidence before the bankruptcy court.

1992. The earliest act of self-dealing Nahman points to in his opening brief occurred on 13 April 1992, when Jacks executed a guaranty on behalf of Zeus to secure his personal obligations to the bank (he executed the security agreement on 16 October 1992; the financing statement was filed 20 October 1992). Even assuming Jacks' self-dealing was fraudulent, Nahman's services were not "obtained by" fraud; Nahman had ceased to provide reports before the self-dealing (and nondisclosure) occurred.

In his petition for rehearing, Nahman claims the record contains evidence of self-dealing by Jacks as early as August 1991, when numerous transfers were made from Zeus' corporate account to Jacks' private practice account. In support, he cites to a copy of a Landmark Bank statement in Jacks' name, but does not refer to the testimony, if any, authenticating the statement or explaining the transactions. We are not obligated to search the record for it. *See Friedman v. Sheila Plotsky Brokers, Inc. (In re Friedman)*, 126 B.R. 63, 68–69 (9th Cir. BAP 1991) (clearly erroneous standard). More importantly, Nahman did not point out this purported act of self-dealing in his opening brief; he has thus waived the argument. *See Sedona Inst.*, 220 B.R. at 76.

Finally, Nahman's complaint contained no allegation of intent to deceive, and he has pointed to no pertinent evidence in the record supporting such an intent.

The bankruptcy court properly granted summary judgment to Jacks on Nahman's claim of nondischargeability based on fraud.

**B.** *Section 523(a)(4)—Fraud or defalcation while acting in a fiduciary capacity*

■ Section 523(a)(4) provides, in part:

A discharge under section 727 ... does not discharge an individual debtor from any debt –

. . . .

(4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny . . . .

The creditor must establish three elements for nondischargeability under this provision: (1) an express trust; (2) that the debt was caused by fraud or defalcation; and (3) that the debtor was a fiduciary to the creditor at the time the debt was created. *Otto v. Niles (In re Niles)*, 106 F.3d 1456, 1459 (9th Cir.1997).

Nahman's theory is that, at the point Zeus became insolvent, Jacks, as its director, owed him a fiduciary duty to administer it for his benefit as a creditor, and that Jacks breached that duty by misappropriating its funds for his personal use, executing a corporate guaranty of his personal obligations to the bank, subjecting corporate assets to the bank's security interest, and then assigning those assets to satisfy his personal obligations to the bank. The bankruptcy court dismissed this claim on two grounds: lack of standing, and for Nahman's failure to show that Jacks owed him any fiduciary duties at the time of the alleged defalcation.

**1.** *Standing*

The bankruptcy court decided that "[t]he most important shortcoming of Nahman's claim in this case is that California statute requires that an action against Jacks under [Cal. Corp.Code] § 316 be a derivative action." *Jacks*, 243 B.R. at 394. We are not convinced that this is fatal. Nahman's claim is that the debt owed him by virtue of the state court judgment results from Jacks' defalcation while acting in a fiduciary capacity and is thus not discharged in bankruptcy.

To dismiss his claim because he would have no right to sue under Cal. Corp.Code § 316 mistakes the § 523(a)(4) inquiry. Just as a debtor need not establish the elements of dischargeability in state court, *Brown v. Felsen*, 442 U.S. 127, 134–36, 99 S.Ct. 2205, 60 L.Ed.2d 767 (1979) (construing the Bankruptcy Act, but cited for a related principle—federal law governs dischargeability—in *Grogan v. Garner*, 498 U.S. 279, 284, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991), construing present Bankruptcy Code), neither is a creditor precluded from establishing the nondischargeability of a state court judgment which is not predicated on findings or a cause of action establishing nondischargeability.

■■■ "To determine the character of the liability upon which the appellant's judgment was founded, we must look to the suit in which it was rendered." *Lawrence T. Lasagna, Inc. v. Foster*, 609 F.2d 392, 395 (9th Cir.1979) (citation omitted). In *Lasagna*, appellant also had contract claims against the corporation from which the debtor officers and directors allegedly had misappropriated and fraudulently transferred assets. The debtors there, as here, "were not originally liable on [the corporate] debt. Their conduct, as described in the complaints and as found by the state court, created a new liability on their part directly to [the appellant]." *Id.* at 396. But for the officers' conduct, there would have been no debt due from the officers; the corporation would have been the only debtor. *Id.* at 395.

In *Lasagna*, as here, standing to create the debt was not needed: it existed by virtue of the state court judgment. The issue is whether or not the debt is nondischargeable under § 523(a)(4). Because the state court had already found that a fiduciary relationship existed between the appellant and the debtors, the *Lasagna* court, ruling under FRCP 12(b)(6), did not need to determine whether such a relationship existed under the rule of *Pepper v. Litton*, 308 U.S. 295, 306–07, 60 S.Ct. 238, 84 L.Ed. 281 (1939) (a director of an insolvent corporation is a fiduciary whose obligation "is designed for the protection of the entire community of interests in the corporation—creditors as well as stockholders").

The state court decision here makes no such finding, but establishes Jacks' liability via the alter ego doctrine. Thus, the bankruptcy court must determine whether the conduct which led the state court to impose liability on Jacks was fraud or defalcation as Nahman's fiduciary.

## 2. *Fiduciary Duty*

### a. *Express Trust*

■■■ Section 523(a)(4) requires an express or technical trust in existence before and independently of the defalcation. *Lewis v. Scott (In re Lewis)*, 97 F.3d 1182, 1185 (9th Cir.1996) (citing *Ragsdale v. Haller*, 780 F.2d 794, 796 (9th Cir.1986)). A trust arising as a consequence of wrongdoing, such as a constructive, resulting, or implied trust, is outside the purview of § 523(a)(4). *Evans v. Pollard (In re Evans)*, 161 B.R. 474, 477 (9th Cir. BAP 1993). Whether a fiduciary is the trustee of an express trust depends on state law, and an express trust may be imposed by common law. *Lewis*, 97 F.3d at 1185–86 (holding that Arizona case law imposes express trust on partners).

■■■ California courts have recognized that "all of the assets of a corporation, immediately on its becoming insolvent, become a trust fund for the benefit of all of its creditors." *Saracco Tank & Welding Co., Ltd. v. Platz*, 65 Cal.App.2d 306, 315, 150 P.2d 918, 923 (1944) (citation omitted). *See also Pepper*, 308 U.S. at 307, 60 S.Ct. 238.

Here, the bankruptcy court rejected the notion that Jacks had any relevant common law fiduciary duties to Nahman and other creditors, concluding that Cal. Corp. Code §§ 166, 500, and 501 (prohibiting unauthorized distributions by directors) "covers the field" of these duties. *Jacks*, 243 B.R. at 392–93. This is consistent with some recent commentary and case law, which cast doubt on whether the California trust fund doctrine continues to provide a basis for the technical trust necessary for § 523(a)(4) nondischargeability. *See generally* 15A William Meade Fletcher et. al., *Fletcher Cyclopedia of the Law of Private Corporations* § 7373 (perm. ed., rev. vol. 2000); *see also Pacific Scene, Inc. v. Penasquitos, Inc.*, 46 Cal.3d 407, 250 Cal. Rptr. 651, 758 P.2d 1182 (1988). In *Pacific Scene*, the California Supreme Court held that, by codifying "detailed statutory remedies" against shareholders of dissolved corporations (Cal. Corp.Code §§ 2009 and 2011), the California legislature had "occupied the field and precluded resort to dormant common law doctrines for the provision of extra-statutory relief." *Id.* at 413, 250 Cal.Rptr. at 655, 758 P.2d at 1185. *See also United States v. Oil Resources, Inc.*, 817 F.2d 1429, 1432–33 (9th Cir.1987).

Nevertheless, the bankruptcy court concluded that the fiduciary relationship between an insolvent corporation's officers and directors and its creditors was a "sufficient trust relationship for the application of § 523(a)(4)." *Jacks*, 243 B.R. at 394 (citing *Berres v. Bruning (In re Bruning)*, 143 B.R. 253 (D.Colo.1992) (applying Colorado law); *Committee v. Haverty (In re Xonics, Inc.)*, 99 B.R. 870 (Bankr.N.D.Ill. 1989) (applying Delaware law); and *Bay 511 Corp. v. Thorsen (In re Thorsen & Co.)*, 98 B.R. 527 (Bankr.D.Colo.1989) (applying Colorado law)).

■ We read this apparent discontinuity in the bankruptcy court's opinion as recognizing that California's Corporation Code provides a remedy for an insolvent corporation's director's violations of fiduciary duties to creditors. This is consistent with the notion that "the common law is not repealed by implication or otherwise, if there is no repugnancy between it and the statute, and it does not appear that the legislature intended to cover the whole subject." *Gray v. Sutherland*, 124 Cal. App.2d 280, 290, 268 P.2d 754, 761 (1954) (citation omitted). California's corporate statutes, while modifying remedies, do not eliminate the trust comprised of corporate assets that arises upon a corporation's insolvency.

We agree with the bankruptcy court, and note that this Panel has held that Oregon's parallel "trust fund doctrine" imposes an express trust sufficient for the application of § 523(a)(4). *Flegel v. Burt & Associates, P.C. (In re Kallmeyer)*, 242 B.R. 492, 496 (9th Cir. BAP 1999).

**b.** *Fraud or defalcation*

■ Defalcation is the misappropriation of trust funds or money held in any fiduciary capacity, or the failure properly to account for such funds. *Lewis*, 97 F.3d at 1186 (citing *Black's Law Dictionary* 417 (6th ed.1990)). If a fiduciary relationship existed between Jacks and the corporation's creditors, Jacks' use of corporate assets to guarantee his personal debt would constitute defalcation, as would his personal use of corporate funds. *See Moreno v. Ashworth (In re Moreno)*, 892 F.2d 417, 421 (5th Cir.1990) (defalcation is willful neglect of duty; no corporate purpose furthered by transfers to corporate insider). We see no reason why executing a corporate guaranty to one creditor for Jacks' own benefit, and not the corpora-

tion's, could not be a defalcation as to Zeus' other creditors.

Because a director's fiduciary duties to creditors do not arise until the corporation is insolvent, the timing of the insolvency is critical. For Nahman to prevail, Jacks must have had a fiduciary duty to Nahman prior to any defalcation.

### c. *Insolvency*

■ The bankruptcy court found the evidence showed that it was Jacks' self-dealing transactions which rendered Zeus insolvent, and thus no prior trust relationship arose. Nahman argues that Zeus was insolvent at all relevant times. However, on the record before us, it is simply unclear when Zeus became insolvent.

The transactions Nahman complains of occurred between April 1992 and July 1993: specifically, Nahman points to the 13 April 1992 execution of the corporate guaranty in favor of the bank, the September 1992 withdrawal of funds from Zeus' bank account to pay a second deed of trust on Jacks' personal residence, and the 21 July 1993 execution of the stipulation with Landmark Bank, irrevocably assigning all of Zeus' assets (that is, transferring from Zeus to Landmark the collateral subject to its security interest). Nahman's opening brief also referred to Jacks' execution, on Zeus' behalf, of a security agreement in favor of the bank encumbering Zeus' assets to guarantee Jacks' personal obligations (without mention that it was given roughly six months after creation of the obligation it secured). Although Nahman provided neither a date for the security agreement nor a valid reference to the excerpts of record, we found in the excerpts a security agreement executed on 16 October 1992 and perfected four days later. We note that, in the bankruptcy court, Nahman did not raise the security agreement as a separate defalcation, in-

stead referring to the execution of the corporate guaranty as a "pledge" of Zeus' assets.

As evidence of Zeus' insolvency, Nahman points to "insufficient funds" checks drawn on Zeus' bank account between May 1991 and April 1992, although testimony in the state court trial indicated Zeus eventually paid most of those checks. In addition, Nahman points to delinquencies on his February and March 1992 invoices totaling approximately $7,000, to the fact that Jacks owed him $100,000 for reports not yet submitted, and to Jacks' admissions of the corporation's cash flow difficulties during 1992.

The bankruptcy court applied the Cal. Corp.Code § 501 test for insolvency: that the corporation is, or, as a result of the prohibited distribution, would be "likely to be unable to meet its liabilities ... as they mature." The parties have not cited, nor have we located, any California case law interpreting the insolvency requirement of that section. The bankruptcy court concluded that a failure to pay one creditor, even repeatedly, did not sufficiently show insolvency under California corporations law, noting that Nahman did not present any evidence "of the quantity of Zeus' other creditors, the amount owing to them, or whether they were paid during the relevant time frame." *Jacks*, 243 B.R. at 390. Consequently, the court found that Jacks owed no fiduciary duty to Nahman before the transactions. We note that the Ninth Circuit has held, in another context, that a "finding that a debtor is generally not paying his debts requires a more general showing of the debtor's financial condition and debt structure than merely establishing the existence of a few unpaid debts." *Semel v. Dill (In re Dill)*, 731 F.2d 629, 632 (9th Cir.1984) (dealing with insolvency determination for purpose of an involuntary petition in bankruptcy). The bank-

ruptcy court correctly concluded that, by this criterion, Nahman had not raised an issue of material fact regarding insolvency during the relevant time period.

But this does not end the inquiry: Nahman next argues that Zeus was insolvent under a balance sheet test. Jacks does not dispute the propriety of a balance sheet test, and we have found no authority prohibiting its application in this context. *Cf. Kallmeyer*, 242 B.R. at 496–97 (affirming bankruptcy court's use of balance sheet test for corporate insolvency in applying Oregon's trust fund doctrine in § 523(a)(4) context, where parties did not dispute test).

The earliest financial statement available, dated 31 January 1993, indicates equity of $59,539.37. However, Nahman asserts that, after adjustments, the corporation had negative equity exceeding $570,000. When the bankruptcy court questioned him at oral argument, Nahman's counsel indicated that the self-dealing transactions occurred in April 1992 and before. Because the financial statements in evidence were dated 31 January 1993 and later, the bankruptcy court considered them too remote to be relevant to the alleged defalcations. As for the July 1993 stipulation, Nahman referred to it in his complaint and motion for summary judgment, but did not mention it at oral argument in the bankruptcy court, and the bankruptcy court did not consider it. It is not clear to us that the stipulation constituted a defalcation, as the assignment merely transformed Zeus' existing obligation to the bank from a contingency to a certainty. As noted, Jacks executed a security agreement on behalf of Zeus in favor of the bank on 16 October 1992, which the bank promptly perfected. The security agreement was not explicitly raised below, perhaps because Nahman did not focus on the delay in its execution, and the bankruptcy court did not consider it. The parties have neither briefed nor argued whether the securing of the pre-existing guarantee might be a distinct defalcation; we do not reach that question.

Although the 31 January 1993 balance sheet did not include the debt to Nahman, Jacks concedes (and is collaterally estopped from disputing) it was $80,000, as the Superior Court determined. Nahman essentially conceded at oral argument in the bankruptcy court that receivables of approximately $140,000 should be included on the balance sheet, but also contends that the balance sheet should be adjusted to include the approximately $490,000 contingent liability to the bank based on the corporate guaranty. He further contends that the $56,211.55 loan to Jacks' private practice, included as an asset, was a bad debt due to Jacks' personal bankruptcy filing. Nahman points to no evidence supporting the latter assertion, but the evidence raises an issue of material fact as to the former: the excerpts of record contain four promissory notes Jacks executed in favor of the bank between March 1989 and April 1990 totaling $488,000.75. The contingent liability, if any, on the corporate guarantee should have been included on the balance sheet. *See Sierra Steel, Inc. v. Totten Tubes, Inc. (In re Sierra Steel, Inc.)*, 96 B.R. 275, 279 (9th Cir. BAP 1989); *see also In re Xonics Photochemical, Inc.*, 841 F.2d 198, 199–200 (7th Cir.1988) (concluding that contingent assets and liabilities should be reduced to their present or expected value before insolvency determination can be made).

On appeal, Jacks never affirmatively asserted Zeus was solvent at any relevant time, nor has he pointed out where in the record he did so in the bankruptcy court. In his summary judgment motion seeking dismissal in the bankruptcy court, Jacks

had the burden of demonstrating that the record contained no evidence to support an essential element of the plaintiff's case. *See Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 43 F.3d 1311, 1315 (9th Cir. 1995). Respecting the corporation's insolvency, he did not do so. Although he filed a declaration with his opposition to Nahman's motion for summary judgment indicating his belief that Zeus was solvent until August 1993, he admitted in that declaration that he was not qualified to make that determination. The only pertinent evidence on the issue is Nahman's.

While that evidence is not sufficient to warrant granting summary judgment to Nahman on his cross-motion, and may not be sufficient to carry the day at trial, in the context of Jack's motion for summary judgment we must view it in the light most favorable to the non-moving party. In so doing, we conclude there remains an issue of material fact regarding Zeus' solvency at the time Jacks executed the corporate guaranty of his personal obligation. If Zeus was insolvent, Jacks' action breached his fiduciary duty to Nahman, and the resulting liability is nondischargeable under § 523(a)(4).

## C. *Section 523(a)(6)—Willful and malicious injury*

■ Section 523 also excepts from discharge debts "for willful and malicious injury by the debtor to another entity or to the property of another entity ...." § 523(a)(6). A willful and malicious injury under this provision requires proof of a "deliberate or intentional *injury,* not merely a deliberate or intentional *act* that leads to injury." *Kawaauhau v. Geiger,* 523 U.S. 57, 61, 118 S.Ct. 974, 140 L.Ed.2d 90 (1998). Relying on the state court's alter ego finding, Nahman alleges that Jacks' self-dealing resulted in Zeus' inability to pay Nahman. In addition, Nahman

alleged that Jacks' self-dealing conduct was willful and malicious. Our analysis of this claim requires consideration of whether the self-dealing is the type of injury actionable under § 523(a)(6), and whether Nahman raised an issue of fact as to Jacks' intent.

### 1. *Injury*

■ Nahman argues that Jacks' assignment of Zeus' receivables to the bank to pay the bank's judgment against him was a willful and malicious injury to his property interest in the receivables, citing *Lasagna,* 609 F.2d 392. In that case, the Ninth Circuit held that the plaintiff had stated a claim under § 17(a)(8) of the Bankruptcy Act (former 11 U.S.C. § 35(a)(8); predecessor to § 523(a)(6)) when he alleged that the officers and directors of a corporation had, among other things, misappropriated and fraudulently transferred corporate assets while the corporation was insolvent, thus injuring his unsecured claim against the corporation. *Id.* at 393–94. Noting that dischargeability under § 35(a)(8) "is determined by a bankrupt's conduct rather than the character of the property injured," *id.* at 394, the *Lasagna* majority rejected the argument that a property interest must be secured or otherwise earmarked to be the subject of a willful and malicious injury.

As the former section excepted from discharge "liabilities for willful and malicious injuries to the person or property of another," language paralleling that of the current section, we see no reason to doubt *Lasagna's* continued authority on this point. *But see Snoke v. Riso (In re Riso),* 978 F.2d 1151, 1153–54 (9th Cir.1992) (holding a right of first refusal is merely a contract right, not a property interest that can be subject to a willful and malicious injury, casting doubt on, but not explicitly overruling *Lasagna* ).

Jacks argues that the state court judgment was based solely on breach of contract claims, and that such claims are not the type of injury encompassed by § 523(a)(6). Were Jacks' initial premise true, his argument might have merit. *See Petralia v. Jercich (In re Jercich)*, 238 F.3d 1202, 1206 (9th Cir.2001), *cert. denied,* — U.S. —, 121 S.Ct. 2552, 150 L.Ed.2d 718 (2001) ("[T]o be excepted from discharge under § 523(a)(6), a breach of contract must be accompanied by some form of 'tortious conduct' that gives rise to 'willful and malicious injury.'"). However, the state court's alter ego finding places this case squarely within the *Lasagna* holding.

Next, Nahman contends Jacks' pledge of Zeus' assets as collateral for his personal obligations and his assignment of Zeus' receivables to the bank injured his receivable from Zeus. The second is not quite correct: it was the giving of the promptly-perfected security interest on 16 October 1992 that removed the receivables from Nahman's reach. But if Zeus was insolvent at either time, and Jack's action was accompanied by the requisite intent, his liability is nondischargeable under § 523(a)(6). As noted above, Zeus' solvency remains to be determined.

### 2. *Intent*

■ The bankruptcy court found that Nahman had not established the requisite intent to injure required under *Geiger*. Since the Supreme Court's ruling, courts have struggled with the intent element of § 523(a)(6). *See Markowitz v. Campbell (In re Markowitz)*, 190 F.3d 455, (6th Cir. 1999); *Miller v. J.D. Abrams Inc. (In re Miller)*, 156 F.3d 598 (5th Cir.1998), *cert. denied,* 526 U.S. 1016, 119 S.Ct. 1249 (1999); *see also Harry Ritchie's Jewelers, Inc. v. Chlebowski (In re Chlebowski)*, 246 B.R. 639, 643–44 (Bankr.D.Or.2000) (dis-

cussing cases), and *Spokane Ry. Credit Union v. Endicott (In re Endicott)*, 254 B.R. 471, 475–78 (Bankr.D.Idaho 2000) (same).

■ As we recently noted, "[a]lthough the [Supreme] Court specifically stated that 'debts arising from recklessly or negligently inflicted injuries do not fall within the compass of § 523(a)(6),' it did not specify what level of intent is necessary to satisfy the requirement that there be a 'deliberate or intentional injury.'" *Baldwin,* 245 B.R. at 135 (quoting *Geiger,* 523 U.S. at 64, 118 S.Ct. 974). We adopted the intent requirement from *Restatement (Second) of Torts* § 8A, as set forth in *Markowitz,* 190 F.3d at 464: that the actor desires to cause consequences of his act, or believes that the consequences are substantially certain to result from it. *Baldwin,* 245 B.R. at 136. The Ninth Circuit has recently accepted this formulation, holding that, for conduct to give rise to a nondischargeable debt under § 523(a)(6), the debtor must either have had a subjective motive to inflict the injury or believed that injury was substantially certain to occur as a result of his conduct. *Jercich,* 238 F.3d at 1208.

In *Baldwin,* we also quoted from *Miller,* 156 F.3d at 603: "[E]ither objective substantial certainty or subjective motive meets the Supreme Court's definition of 'willful ... injury' in § 523(a)(6)." 245 B.R. at 136. Nahman argues that an objective substantial certainty of injury to his receivable from Zeus satisfies the intent. Although *Baldwin* did not explicitly examine the possible distinction between an objective and a subjective standard, we recently clarified that issue, explicitly adopting the Restatement's subjective standard and rejecting the objective standard articulated in *Miller. Su v. Carrillo (In re Su),* 259 B.R. 909, 913 (9th Cir. BAP 2001).

Nevertheless, subjective intent may be gleaned from objective factors. The use of the term "objective" is not talismanic nor at odds with *Geiger* if it is viewed as simply recognizing that a debtor will have to deal with any direct or circumstantial evidence which would indicate that he must have had a substantially certain belief that his act would injure, notwithstanding any subjective denial of such knowledge. The court does not substitute its view of what was substantially certain to result for the *debtor's* understanding. Rather, the court considers all probative evidence which relates to what the debtor knew, including what he must have known (i.e., objectively) as well as what he admits to having known.

*Endicott*, 254 B.R. at 476 n. 9 (emphasis in original) (citation omitted). In other words, "[g]iven that a debtor is unlikely to admit that he or she was substantially certain that the injury in question would result from his or her acts, such understanding can be established through circumstantial evidence." *Harr v. Harr (In re Harr)*, No. 97–17560, Adv. No. 98–1182, 2000 WL 620799, at *6 (Bankr.S.D.Ohio Mar. 24, 2000) (citations omitted). We agree: this is analogous to a determination of fraud in a § 523(a)(2) action. As the Ninth Circuit recently explained in that context:

Just as a debtor's testimony about his subjective intent is not by itself legally dispositive, neither are the objective inferences drawn from consideration of the *Dougherty* factors [*Citibank South Dakota, N.A. v. Dougherty (In re Dougherty)*, 84 B.R. 653, 657 (9th Cir. BAP 1988) ]. Because fraud lurks in the shadows, it must usually be brought to light by consideration of circumstantial evidence. In that context, the *Dougherty* factors provide a useful means of

objectively discerning intent based on the probabilities of human conduct. *Dougherty* does not handcuff the trier of fact, who is in the best position to balance the objective evidence against the witness's testimony and credibility.

*Household Credit Servs., Inc. v. Ettell (In re Ettell)*, 188 F.3d 1141, 1145 (9th Cir. 1999) (footnotes omitted). The footnote to that passage elaborates:

This is entirely consistent with a "totality of the circumstances" approach, in that it requires that intent be ascertained through an analysis of all of the surrounding circumstances, rather than just one factor. Read together, our decisions in *[In re] Eashai[*, 87 F.3d 1082 (9th Cir.1996)], *[In re] Anastas[*, 94 F.3d 1280 (9th Cir.1996)], and *[In re] Hashemi[*, 104 F.3d 1122 (9th Cir.1996)] simply mean that the debtor's subjective intent must be evaluated in light of objective factors. Because no single objective factor is dispositive, assessment of intent is thus left to the fact-finder.

*Id.* at 1145 n. 3 (citations omitted).

Nahman contends that, because of Jacks' dire personal financial situation, injury to his receivable was substantially certain to occur once Jacks pledged Zeus' assets as collateral for his personal obligations, and that his receivable was injured when Jacks signed the stipulation assigning all of Zeus' receivables to the bank. This is not strictly so; the assignment of collateral—the receivables—to the secured party had no effect on Nahman's ability to collect against those receivables, already subject to the bank's security interest. But the perfection of the security interest in those receivables did. Nahman's contention has merit if Zeus was then insolvent, *see Lasagna*, 609 F.2d at 393–94, and, as discussed above, Zeus' insolvency in October 1992 is an issue of material fact.

Although the record does not contain direct evidence that Jacks intended to injure Nahman by his conduct, if Zeus was insolvent when Jacks caused it to guarantee his personal obligations, or to secure that guaranty, injury to Nahman was an objective substantial certainty. That objective substantial certainty of harm is one factor to be considered in determining whether Jacks intended to injure Nahman, or believed that injury was substantially certain to occur as the result of his conduct. There remains an issue of material fact as to whether Jacks had the requisite intent under § 523(a)(6).

We will therefore reverse summary judgment on the § 523(a)(6) count and remand on the issues of insolvency, intent, and malice (*see Jercich,* in which the Ninth Circuit specifically rejected the view that *Geiger* had collapsed the "willful" and "malicious" prongs of § 523(a)(6) into a single inquiry. 238 F.3d at 1209 n. 36). Nahman must show "(1) a wrongful act, (2) done intentionally, (3) which necessarily causes injury, and (4) [that] is done without just cause or excuse." *Id.* at 1209.

## VI. CONCLUSION

We AFFIRM the dismissal of the § 523(a)(2) count, but conclude the bankruptcy court erred regarding the § 523(a)(4) and (a)(6) claims. The evidence raised issues of material fact respecting Zeus' insolvency at the time of Jacks' execution of the corporate guaranty of his personal obligation to the bank, and of his intent, as that element of nondischargeability under § 523(a)(6) has been clarified. Accordingly, we REVERSE and REMAND for further proceedings.